UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIVINGSTON EDUCATIONAL SERVICE
AGENCY; SAGINAW INTERMEDIATE
SCHOOL DISTRICT; WALLED LAKE
CONSOLIDATED SCHOOL DISTRICT;
and WAYNE-WESTLAND COMMUNITY
SCHOOLS,

          Plaintiffs,

v.

Xavier Becerra, SECRETARY OF
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; DEPARTMENT OF HEALTH
AND HUMAN SERVICES; Jooyeun Chang,
ASSISTANT SECRETARY OF
ADMINISTRATION FOR CHILDREN AND
FAMILIES; ADMINISTRATION FOR
CHILDREN AND FAMILIES; and
Bernadine Futrell, DIRECTOR OF THE
OFFICE OF HEAD START,

          Defendants.

Case No. 22-cv-10127

Hon. Nancy G. Edmunds

_____/

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [5]**

Head Start is a federal discretionary grant program that promotes school readiness in low-income children through age five. *See* 42 U.S.C. § 9831. The Secretary of Health and Human Services administers the Head Start program and is tasked with issuing regulations prescribing standards for Head Start grantees. *Id.* § 9836a(a). In November 2021, the Secretary announced that, in order to receive Head Start funding, participating facilities must ensure that their staff, contractors, and volunteers—unless exempt for medical or religious reasons—are vaccinated against COVID-19. 86 Fed. Reg. 68052 (2021) (the "Rule"). The Rule took effect on January 31, 2022. *See* 45 C.F.R. §§ 1302.93, 1302.94.

Days before the January 31 deadline, four Michigan school districts brought the present case in which they ask the Court to declare the Rule unlawful and enjoin its enforcement in their districts. (ECF No. 1.) Upon Plaintiffs' motion, and to preserve the status quo, the Court entered a temporary restraining order enjoining Defendants from enforcing the Rule against the unvaccinated employees Plaintiffs identified. (ECF Nos. 12, 20.) Now before the Court is Plaintiffs' Motion for Preliminary Injunction. (ECF No. 5.) The Government responded in opposition to the Motion and Plaintiffs filed a reply. (ECF Nos. 35, 39.) The Michigan Legislature filed an amicus brief supporting Plaintiffs and asking the Court to enjoin the rule throughout the State of Michigan. (ECF No. 30.) The Court held a hearing to allow the parties to offer evidence and argument. For the reasons that follow, the Court denies Plaintiffs' Motion for Preliminary Injunction. (ECF No. 5.)

I.      **Background**

A.      **Head Start and Head Start Performance Standards**

Head Start seeks to break the cycle of poverty through the provision of comprehensive health, education, parental involvement, nutritional, social, and other services to low income preschool children and their families. *See, e.g.*, 42 U.S.C. § 9831. The program is funded through a direct federal-to-local grant that does not pass through the state. *See id.* §§ 9834, 9835. Because Head Start involves discretionary grants, the federal government maintains the authority to choose which entities receive grants. No one is entitled to a Head Start grant or to attend a Head Start program. *See* Dep't of Health and Hum. Servs. ("HHS"), Grant Policy Statement, at I-1, I-3 to I-4 (Jan. 1, 2007), https://perma.cc/PME5-9724; *see also* 42 U.S.C. § 9833 (providing that the Secretary "may . . . provide financial assistance" to an eligible agency upon the agency's application for the same). Any entity that chooses to apply for and receives a Head Start grant agrees that it

will meet all of the performance standards HHS imposes, even if those entities are school districts or educational institutions. *See* Grant Policy Statement, *supra*.; 42 U.S.C. §§ 9836(d)(2)(F), 9836a(a)(1). And if a Head Start entity determines that it can no longer maintain the standards set for Head Start, it is free to relinquish its grant and provide services through its own non-Head Start pre-K program instead.[1]

Congress authorized the Secretary of HHS (the "Secretary") to impose and "modify, as necessary" the performance standards imposed upon recipients of Head Start grants. 42 U.S.C. § 9836a(a)(1). Included among the modifiable standards are those related to "administrative and financial management," *id.* § 9836a(a)(1)(C), "the condition and location of facilities (including indoor air quality assessment standards, where appropriate)," *id.* § 9836a(a)(1)(D), and "such other standards as the Secretary finds to be appropriate," *id.* § 9836a(1)(E).

Throughout the years, this authorization led to standards that responded to the most pressing health and medical threats of the times. For example, in the 1990s, guidance as an appendix to the performance standards included the appropriate treatment of children with HIV. 45 C.F.R. § 1308 App'x (2015). In 1996, HHS added health examinations and tuberculosis screening for staff and regular volunteers to the Head Start Program Performance Standards. 61 Fed. Reg. 57186, 57210, 57223 (1996). And in response to suggestions in public comments that it no longer made sense to single out tuberculosis, HHS revised the staff health standard in 2016 to include more general language about staff health and communicable diseases. Head Start Performance Standards, 81 Fed. Reg. 61294, 61357, 61433 (2016).

---

[1] This has been done at least once before by a school in the Maryland school system. (ECF No. 35, PageID.596.)

Other standards addressed similar health goals. In 1975, just one year after Congress made Head Start a permanent program, Head Start grantees were required to assist program participants with the provision and completion of "all recommended immunizations," including diphtheria, pertussis, tetanus, polio, and measles. 45 C.F.R. § 1304.3-4(2) (1975) (ECF No. 39-3, PageID.830.) Head Start facilities were also required to space infant cribs at least three feet apart and exclude children with contagious illnesses from the program so as not to "pose[ ] a significant risk to the health or safety of the child or anyone in contact with the child." 45 C.F.R. §§ 1304.22(b), 1304.22(e)(7) (2011).

## B.    The COVID-19 Pandemic and Head Start Interim Final Rule

The COVID-19 pandemic first hit the United States in 2020. Caused by the SARS-CoV-2 virus, COVID-19 is considered to be mainly transmissible through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19. 86 Fed. Reg. 68052. In an effort to stop the spread of COVID-19, more than 90 percent of Head Start programs closed all in-person operations for varying lengths of time in the spring of 2020. *Id.* 68058. By December 2020, over 13,500 Head Start facilities still had not resumed full in-person operations, but in May 2021, HHS communicated its expectation that Head Start programs resume fully in-person services beginning the following January. *Id.* 68058, 68062.

On September 9, 2021, President Biden announced his administration's plan to combat the COVID-19 pandemic. (ECF No. 5, PageID.134.) Consistent with this plan, on November 30, 2021, the Secretary of HHS issued an interim final rule with comment amending the existing conditions of participation in Head Start to add a new requirement— that facilities ensure that those interacting with Head Start students be vaccinated for

COVID-19.[2] *See* Dep't of HHS, Interim Final Rule, Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 Fed. Reg. 68052 (2021) (codified at 45 C.F.R. pt. 1302) (the "Rule," or "Head Start mandate"). The Rule requires facilities to offer medical and religious exemptions, and track and securely document the vaccination or exemption status of each staff member. 86 Fed. Reg. 68061.

Relying on data that indicates "[v]accination is the most important measure for reducing risk for SARS-CoV-2 transmission," *id.* 68052, the Secretary issued the Rule after finding it "necessary and appropriate to set health and safety standards for the condition of Head Start facilities that ensure the reduction in transmission of the SARS-CoV-2 [virus] and to avoid severe illness, hospitalization, and death among program participants," *id.* 68054. He found the efficacy of COVID-19 vaccinations had been demonstrated, that vaccines continued to be effective against the then-dominant Delta variant, and that emerging evidence suggested that infected vaccinated people had the potential to be less infectious than infected unvaccinated people, thus decreasing transmission risk. *Id.* 68052.

In developing the Rule, the Secretary consulted with experts in child health and considered the disproportionate effect of COVID-19 on the low-income and minority communities Head Start serves, stating there was potential for "devastating consequences" for children and families due to program closures and service interruptions caused by COVID-19 infections. *Id.* 68054, 68056. The Secretary also found that, because "children under age 5 are too young to be vaccinated at this time, requiring masking and vaccination among everyone who is eligible are the best defenses against COVID-19 . . . ." *Id.* 68055.

---

[2] The rule also requires masking in most situations for individuals two years of age and older, but Plaintiffs do not challenge this provision of the rule. (ECF No. 5, PageID.138.)

The Secretary issued the Rule as an interim final rule, rather than through the typical notice-and-comment procedures, after finding "good cause" that the vaccine provision of the Rule should be made effective by January 31, 2022. *Id.* 68059. That good cause related to emerging indications of potential increases in COVID-19 cases associated with the SARS-CoV-2 Delta variant as well as the anticipated full return to in-person Head Start services in January 2022. *Id.* 68058-59, 68062. The Secretary thus found that a delay in imposing the vaccine mandate would be "impracticable and contrary to the public interest." *Id.* 68059. Public comments were accepted and considered, however, from the time the Rule was announced on November 30 until at least December 30, 2021. *Id.* 68052.

### C.    The Present Case

Nearly two months after the Rule was announced and eleven days before it was set to take effect, Plaintiffs filed this action. (ECF No. 1.) Plaintiffs now seek a preliminary injunction to enjoin Defendants from enforcing the Rule in their districts. (ECF No. 5.) They argue the Rule is unlawful and thus, they are likely to succeed on the merits of their case. *Id.* Additionally, they identify several staff members who would choose to quit their positions rather than get vaccinated. *Id.* Plaintiffs argue these staff and other vacancies will cause irreparable harm to their programs and families they serve. *Id.* The Michigan Legislature agrees with Plaintiffs and filed an amicus brief. (ECF No. 30.) In its brief, the Legislature argues the Rule upsets the balance of powers between the states and federal government and should be enjoined throughout the State of Michigan. (ECF No. 30.) But the Michigan Attorney General, who is charged with protecting and serving the people and interests of Michigan, has not joined this lawsuit, or otherwise indicated that the people of Michigan support Plaintiffs' position or requested relief.

II.     **Legal Standard**

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions. A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 444 (6th Cir. 2003) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). It is "a strong arm of equity" that should not be extended to cases that can be remedied by damages or those which are doubtful or do not come within well-established principles of law. *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972). A motion for preliminary injunction is granted when "the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). "In addressing a motion for a preliminary injunction, a court should consider: (1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir.1997)).

III.    **Analysis**

A.     **Likelihood of Success on the Merits**

First, the Court finds that Plaintiffs have not established they are likely to succeed on the merits of their claims.

*1.     The Secretary Had Statutory Authority to Issue the Rule*

"The challenges posed by a global pandemic do not allow a federal agency to exercise power that Congress has not conferred upon it. *At the same time, such unprecedented circumstances provide no grounds for limiting the exercise of authorities the*

7

*agency has long been recognized to have*." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (emphasis added).

The Head Start Act authorizes the Secretary to adopt "standards relating to the condition and location of [Head Start] facilities," as well as other "administrative . . . standards" necessary for safely carrying out day-to-day operations of Head Start programs. 42 U.S.C. § 9836a(a)(1)(C), (D). Additionally, Congress vested the Secretary with discretion to establish standards he "finds to be appropriate" for Head Start agencies and programs. *Id.* § 9836a(a)(1)(E). Addressing similar enabling language in other statutes, the Supreme Court has concluded that this language grants the agency "broad authority." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 365 (1973); *see also GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 930 (9th Cir. 2021) ("statutory language—'appropriate' and 'necessary and proper'—is a hallmark of vast discretion" (footnote omitted)).

Here, the Rule plainly falls within the Secretary's authority. Plaintiffs argue the Rule cannot be considered administrative "under any permissible construction of that word," (ECF No. 5, PageID.142), but the Court disagrees. As the Government noted at the hearing, the Secretary is trying to "keep the doors open" at Head Start, and the Rule seeks to accomplish that goal after nearly two years of program closures and staff shortages due to COVID-19. *See* 42 U.S.C. § 9836a(a)(1)(C).

The Rule also falls within the Secretary's authority to regulate "the condition and location of facilities." *Id.* § 9836(a)(1)(D). "COVID-19 is a highly contagious, dangerous, and . . . deadly disease," *Missouri*, 142 S. Ct. at 652, which spreads through the air via respiratory droplets. Notably, Congress included concerns regarding "indoor air quality" among those related to "the condition and location of [Head Start] facilities." *Id.* § 9836a(a)(1)(D). As both COVID-19 and tuberculosis are spread through the air, standards that can reduce these

8

transmissions result in indoor air that is free, or mostly free, of these pathogens. *See* 86 Fed. Reg. 68052 ("SARS-CoV-2, the infectious agent that causes COVID-19, is considered to be mainly transmissible through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19"); CDC, Tuberculosis (TB): How TB Spreads (March 11, 2016), https://www.cdc.gov/tb/topic/basics/howtbspreads.htm. According to the Secretary's findings, vaccinated persons "are potentially less infectious, and infectious for shorter periods of time compared to infected unvaccinated persons," 86 Fed. Reg. 68053. It follows that the "indoor air quality," in the case of COVID-19 infection, would be improved if the infected individual is vaccinated.

Finally, the Rule is authorized by the broad grant of authority given to the Secretary to promulgate regulations "he finds to be appropriate." *See* 42 U.S.C. § 9836a(a)(1)(E). "Where the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act . . . the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning*, 411 U.S. at 369 (quoting *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 280-81 (1969)). The same is true of statutes that authorize regulations that the Secretary finds to be "appropriate." *See, e.g.*, *Arkansas v. Oklahoma*, 503 U.S. 91, 105 (1992); *GEO Grp., Inc.*, 15 F.4th at 930. Here, the Head Start Act states that its purpose is "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development—*in a learning environment* . . . ." 42 U.S.C. § 9831(1) (emphasis added). Program closures, the unavailability of in-person programming, and staff shortages due to COVID-19 infection or exposure prevent Head Start participants from being surrounded by a learning environment. The Rule aims to assist Head Start facilities with minimizing these COVID-19 related

disruptions and "keep the doors open" providing consistency and stability to Head Start participants and their families.

The Secretary's authority to issue the Rule is confirmed by his authority to identify and order the correction of deficiencies in Head Start programs. *See* 42 U.S.C. § 9836a(e)(1). The Head Start Act defines a "deficiency" as "a systematic or substantial material failure of an agency in an area of performance that the Secretary determines involves—(i) a threat to the health, safety, or civil rights of children or staff; [or] (iii) a failure to comply with standards related to early childhood development and health services . . . ." *Id.* § 9832(2)(A). Because the Secretary may issue deficiencies on these grounds, it follows that he may establish "standards related to early childhood development and health services" and "the health [and] safety . . . of children or staff," including vaccination requirements. *See id.*; *see also Missouri*, 142 S. Ct. at 652 (explaining that a vaccination requirement "fits neatly within the language of [a] statute" addressed to the "health and safety of individuals"); 86 Fed. Reg. 68056 ("[R]equiring vaccination among Head Start staff is not only an issue of personal health, but also promotes public and community health and health equity for children and staff in Head Start programs.").

Thus, as the Supreme Court recently found with regard to a similar vaccine mandate issued under similar authority, the Rule "fits neatly within the language of the statute." *See Missouri*, 142 S. Ct. at 652.

### 2.   *Supreme Court Caselaw Supports this Court's Finding*

Recent Supreme Court caselaw also supports this Court's finding that the Secretary's rule falls within the authorities that Congress has conferred upon him.

The Biden administration issued a total of five federal COVID-19 vaccine mandates from September 2021 through November 2021: a large employer vaccine-or-test mandate

by the Occupational Safety and Health Administration ("OSHA"), a vaccine mandate for healthcare workers who treat Medicare and Medicaid patients by the Centers for Medicare and Medicaid Services ("CMS"), a vaccine mandate for all federal employees and one for employees of federal contractors, and finally the vaccine mandate for Head Start, which is the subject of this case. (ECF No. 5, PageID.134.) Each mandate was challenged to some degree in varying districts across the country,[3] but so far, the Supreme Court has addressed only the OSHA and CMS mandates. *See National Federation of Independent Businesses v. Department of Labor*, 142 S. Ct. 661 (2022) ("*NFIB*"); *Missouri*, 142 S. Ct. at 647.

In *NFIB*, the applicants requested a stay of the Secretary of Labor's interim final rule, issued through OSHA, that requires roughly 84 million workers—virtually all those who worked for employers with at least 100 employees—to either get vaccinated for COVID-19 or get tested weekly at their own expense (the "OSHA mandate"). *NFIB*, 142 S. Ct. at 662; 86 Fed. Reg. 61402 (2021). The Court's analysis centered on the plain text of the authorizing statute as well as OSHA's history and purpose in regulating workplace standards. *NFIB*, 142 S. Ct. at 664-66. First, the Court found the statute did not plainly authorize OSHA's mandate. *Id.* at 665. The Occupational Safety and Health Act empowers the Secretary of Labor to set "*occupational* safety and health standards," and "impose emergency temporary standards necessary to protect 'employees' from grave danger in the workplace." *Id.* (quoting 29 U.S.C. §§ 655(b), 655(c)(1)) (emphasis in the original). This specific language and OSHA's purpose in regulating "*workplace* safety standards" thus limited OSHA's authority to

---

[3] The Head Start Rule at issue here has already been challenged in two district courts and injunctions were granted to the plaintiffs in those cases. *See Texas v. Becerra*, No. 5:21-CV-300-H, 2021 WL 6198109, at *26 (N.D. Tex. Dec. 31, 2021); *Louisiana v. Becerra*, No. 3:21-CV-04370, 2022 WL 16571, at *8 (W.D. La. Jan. 1, 2022). These decisions are not binding here and were issued before the Supreme Court's decision in *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), which upheld a similar vaccination requirement.

regulations addressing workplace and occupational hazards. *Id.* (emphasis in the original). The "lack of historical precedent" for the OSHA mandate was also a "telling indication that the mandate extends beyond the agency's legitimate reach"—OSHA had never before promulgated a regulation "addressing a threat that is untethered, in any causal sense, from the workplace." *Id.* Thus, the Court found that the applicants would likely succeed on their claim that the Secretary of Labor lacked authority to impose the OSHA mandate. *Id.* at 664-65.

The same day the *NFIB* decision was released, the Court issued a second opinion in *Biden v. Missouri*. There, the Supreme Court examined another interim final rule issued by the Secretary of HHS in response to the COVID-19 pandemic (the "CMS mandate"). The CMS mandate requires facilities that participate in federal Medicare and Medicaid programs to ensure their covered staff are vaccinated against COVID-19. *See Missouri*, 142 S. Ct. at 652; 86 Fed. Reg. 61555 (2021). This rule "effectively mandated vaccination for 10 million healthcare workers." *Id.* at 655 (Thomas, J., dissenting).

As discussed in *Missouri*, the Secretary issued the CMS mandate "after finding that vaccination of healthcare workers against COVID-19 was 'necessary for the health and safety of individuals to whom care and services are furnished.'" *Missouri*, 142 S. Ct. at 651 (quoting 86 Fed. Reg. 61561). That determination was based on numerous scientific studies that showed SARS-CoV-2 can spread between healthcare workers and their patients and that such spread is more likely when the healthcare worker was not vaccinated. *Id.* (citing 86 Fed. Reg. 61558-61561, 61567-61568, 61585-61586). The Secretary found that transmission of the virus to Medicare and Medicaid patients was especially dangerous as those patients are often elderly, disabled, or otherwise in poor health. *Id.* (citing 86 Fed. Reg. 61566, 61609). Without a vaccine requirement, he stated, there was also a risk that patients

would forgo seeking medical care to limit potential exposure to the virus. *Id.* (citing 86 Fed. Reg. 61588). Additionally, the Secretary noted that staffing shortages caused by COVID-19 related exposures or illness had disrupted patient care. *Id.* (citing 86 Fed. Reg. 61559).

In contrast to its holding in *NFIB*, the Supreme Court found that the CMS mandate fell within the authorities that Congress had conferred upon the Secretary. *Id.* at 652. The Court agreed with the Secretary that "COVID-19 is a highly contagious, dangerous, and—especially for Medicare and Medicaid patients—deadly disease," and noted the Secretary's related conclusion that "a vaccine mandate is 'necessary to promote and protect patient health and safety' in the face of the ongoing pandemic." *Id.* (citing 86 Fed. Reg. 61613). Finding that the CMS mandate "fits neatly within the language of the statute," the Court held that the Secretary did not exceed his authority by requiring covered facilities to ensure their employees were vaccinated against COVID-19 "in order to remain eligible for Medicare and Medicaid dollars." *Id.* at 652, 653.

Plaintiffs here would prefer this Court follow *NFIB* and find the Secretary lacked authority to issue the Rule, but the present case is more analogous to *Missouri* for several reasons. First, the OSHA mandate applies to *private employers* rather than participants in federally funded programs as is the case here, and in *Missouri*. *See id.*; ECF No. 35, PageID.595-96. Next, the OSHA mandate failed in part because of its "one-size-fits-all sledgehammer" approach that applied to half the nation's workforce regardless of the circumstances surrounding the particular type employment. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021); *see also NFIB*, 142 S. Ct. at 664 ("The regulation . . . operates as a blunt instrument. It draws no distinctions based on industry or risk of exposure to COVID-19. Thus, most lifeguards and linemen face the same regulations as do medics and meatpackers.") The Court in *NFIB* made clear that "[w]here the virus poses a special

danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible." Such are the circumstances here and in *Missouri*, where the Head Start and CMS mandates are tailored to protect those who work in places with or provide services to at-risk individuals—Medicare and Medicaid patients and children, often from minority and low income backgrounds, who are too young to be vaccinated. Furthermore, there is a parallel between Medicare and Medicaid patients who may "forgo seeking medically necessary care" due to "fear of exposure to the virus" and Head Start children and families who may opt not to attend Head Start to avoid contact with unvaccinated teachers. *See Missouri*, 142. S. Ct. at 651. This creates a further risk to the health and safety, or the opportunity, of these already at-risk groups.

> 3.     *The Rule Satisfies Step Two of the Chevron Deference Framework*

Plaintiffs contend that the Rule exceeds the Secretary's authority under the Head Start Act because Congress did not specifically mention "mandatory vaccination," but the Supreme Court effectively rejected this argument in *Missouri*. *See Missouri*, 142 S. Ct. at 652. In any case, even if this Court were to find that Congress has not "directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), the Secretary's interpretation is, at a minimum, "based on a permissible construction of the statute." *Id.* at 843.

In order to determine whether an interpretation is permissible, courts consider whether the agency's interpretation matches the purpose of the statute and the history of past regulation in the area, in addition to the text of the statute itself. *See Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998). Here, the Head Start mandate meets this test. Congress created the Head Start program to help low-income children and their families break the cycle of poverty. *See, e.g.*, 86 Fed. Reg. 68068. To do this, Head

Start facilities provide critical services to meet the health, nutrition, and early learning needs of these children and families. *Id.* at 68057. Programs provide healthy nutritious meals to children and provide diapers for babies and toddlers. *Id.* If a program must close its facilities for a designated period of time due to an outbreak of COVID-19, children at risk will not receive these and other critical in-person services. Furthermore, the Secretary found that "program closures limit the ability of Head Start families to work or seek educational opportunities," imposing significant costs on families that often earn low wages and do not accumulate sick time. *Id.* Given the Secretary's finding that "fully vaccinated adults were six times less likely to become infected, twelve times less likely to be hospitalized and eleven times less likely to die from COVID-19 compared to unvaccinated adults," *id.* at 68052, requiring adults with whom the children interact to be vaccinated leads to the safe and sustained in-person services the Head Start Act aims to provide.

Head Start's history of past health and safety regulations also confirms the reasonableness of the Secretary's construction of his own authority. As is the case with facilities that receive Medicare and Medicaid funds, Head Start grantees necessarily agree to abide by a long list of detailed conditions established by the Secretary. *See id.* at 650-51; Grant Policy Statement, *supra.*; 42 U.S.C. §§ 9836(d)(2)(F), 9836a(a)(1). And unlike OSHA's history of making rules that were tethered to the workplace, *NFIB*, 142 S. Ct. at 662, the Secretary of HHS has a history of addressing "Staff health and wellness" including modifying conditions to prevent health threats that are not necessarily confined to the classroom. *See, e.g.*, 45 C.F.R. § 1302.93; 81 Fed. Reg. 61294, 61357, 61433 (2016) (requiring staff to be screened for "communicable diseases.") Indeed, many of the aforementioned conditions have included requirements aimed at creating a safe and healthy

15

environment for staff, children, and other participants. *See, e.g.*, 61 Fed. Reg. 57210, 57223 (1996); 45 C.F.R. 1304.22(e)(7) (2011); 86 Fed. Reg. 68052 (2021).

Plaintiffs, of course, are correct in their assertion that the Secretary "has never before mandated vaccination for Head Start staff, contractors, or volunteers . . . ." (ECF No. 5, PageID.138.) But *Missouri* responds directly to a similar argument, stating "[o]f course the vaccine mandate goes further than what the Secretary has done in the past to implement infection control. *But he has never had to address an infection problem of this scale and scope before*." *Missouri*, 142 S. Ct. at 653 (emphasis added).

Thus, the Court agrees with the Government that the Secretary's construction of its own authority is reasonable. *See Chevron*, 467 U.S. at 843 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. . . ."). Accordingly, and consistent with the Supreme Court's holding in *Missouri*, the Court concludes that the Secretary did not exceed his statutory authority in requiring that, "in order to remain eligible for [Head Start] dollars," the facilities covered by the Rule must ensure that their staff, contractors, and volunteers are vaccinated against COVID-19. *See Missouri*, 142 S. Ct. at 653.

### 4. Plaintiffs' Remaining Arguments are Unavailing

The Court also disagrees with Plaintiffs' additional arguments.

First, the Rule is not arbitrary and capricious. This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). A court's review is "narrow" and the court "is not to substitute its judgment for that of the agency." *Hosseini v. Nelson*, 911 F.3d 366, 371 (6th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Ky. Coal Ass'n v. Tenn. Valley Auth.*, 804 F.3d 799, 801 (6th

16

Cir. 2015) (APA standard is not an "invitation for judicial second-guessing"). Additionally, the Court's review should be confined to the record before the agency, not "some new record made initially in the reviewing court." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.*, 286 F.3d 382, 387 (6th Cir. 2002) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

Plaintiffs argue that certain authorities cited by the Secretary indicate that classrooms were able to operate safely throughout the pandemic, even without vaccines. *See generally*, 86 Fed. Reg. 68054 n. 30, 68056 n. 50. But the Court's "expertise does not lie in technical matters." *Pub. Citizen Health Rsch. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986). "[I]t is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from facts and probabilities on the record to a policy conclusion." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). Here, HHS adopted a reasonable Rule after considering the relevant issues and dozens of scientific and other authorities. Through 50 pages, the Secretary reasonably explained his findings based on relevant data that (1) evidence supports the vaccine requirement; (2) HHS considered alternative options; (3) vaccination reduces SARS-CoV-2 Transmission; and (4) HHS considered relevant costs. *See generally*, 86 Fed. Reg. at 68052–68101. The role of this Court is to "simply ensure[ ] that the agency has acted within a zone of reasonableness," and the Secretary has done that here. *See Prometheus Radio Project*, 141 S. Ct. at 1158; *see also Missouri*, 142 S. Ct. at 653 (rejecting an arbitrary-and-capricious challenge to the CMS mandate).

Plaintiffs' other procedural and statutory challenges also fail. The Secretary found good cause to delay notice and comment due to emerging indications of potential increases in COVID-19 cases as well as the anticipated full return to in-person Head Start services in

January 2022. Thus, as in *Missouri*, the Secretary's finding of good cause "constitutes the something specific required to forgo notice and comment." *Id.* at 654 (quotation marks and citation omitted). And the 82 days that it took to publish the Rule after it was first announced on September 9, 2021, did not "constitute[ ] 'delay' inconsistent with the Secretary's finding of good cause." *See id.* Furthermore, because the Secretary had good cause to dispense with notice and comment rulemaking, Plaintiffs' argument that the Rule violates the Congressional Review Act is also unavailing. *See* 5 U.S.C. § 808(2) (excusing compliance with the Congressional Review Act for good cause).

The Court also follows *Missouri* in finding that the Secretary was not required to consult with the required experts in advance of issuing the Rule. *See id.*; 42 U.S.C. § 9836a(a)(2)(A). "Consistent with the existence of the good cause exception, which was properly invoked here, consultation during the deferred notice-and-comment period is permissible." *Missouri*, 142 S. Ct. at 654. And while Plaintiffs object on the basis that any revision to the Head Start performance standards must not "result in the elimination of or any reduction in quality, scope, or types of . . . services required to be provided," *see* 42 U.S.C. § 9836a(a)(2)(C)(ii), and that the Rule may cause significant loss of staff, the Court must defer to the Secretary's finding that the benefits of the Rule outweigh its costs including any temporary loss of staff. *See, e.g.*, 86 Fed. Reg. 68064. For instance, the Secretary valued the costs associated with Head Start staff vacancies as well as the value of time savings for parents when a COVID-19 case is averted and determined that each vacancy caused approximately 95 hours of time costs while each COVID-19 case amounted to double that estimate. *Id.* 68091. Thus, while the Secretary acknowledged the potential harm to parents and participants associated with quitters, he determined that the Rule would ultimately improve the consistency and reliability of Head Start services.

Finally, the Rule does not violate the Separation of Powers Doctrine, the Spending Clause, or the Tenth Amendment. Plaintiffs argue the Rule violates the separation of powers doctrine because permitting the Secretary to modify standards he "finds to be appropriate," 42 U.S.C. § 9836a(a)(1)(E), amounts to a "limitless" delegation of Congressional power. (ECF No. 5, PageID.165.) But many Congressional statutes use similar terminology, and Plaintiff has not identified a single case which finds one of those statutes to be in violation of the Separation of Powers Doctrine. Rather, caselaw prescribes that a Congressional delegation of authority to an Executive Branch agency is lawful as long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). Here, the Secretary's statutory authority to protect the health and safety of Head Start students and personnel meets this minimal standard. Any performance standards modified under this subsection's authority, must also be both "appropriate" and consistent with the Head Start Act's broad purpose. *See, e.g.*, *Arkansas v. Oklahoma*, 503 U.S. 91, 105 (1992). Thus, the Secretary's power is reasonably constrained.

Similarly, the Rule complies with the Spending Clause and the Tenth Amendment. Under the Spending Clause, Congress may impose conditions on federal grants to states so long as it "do[es] so unambiguously" so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Grant recipients are aware when they apply to the program that they must abide by the Head Start Performance Standards and that they are free to leave the program and operate outside the Secretary's standards if they choose to do so. *See, e.g.*, Grant Policy Statement, *supra.*; 42 U.S.C. §§ 9836(d)(2)(F), 9836a(a)(1). The Rule also puts grant recipients on notice that they are obligated to comply with the vaccine requirement to continue receiving Head Start

funding. A grant recipient is therefore capable of making "an informed," voluntary decision whether to accept the attendant obligations of contracting with the Federal Government. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("[T]he Supreme Court has held that conditions may be 'largely indeterminate,'" and yet constitutionally permissible, as long as the States have clear notice that accepting funds "obligate[s them] to comply with [the conditions].") (quoting *Pennhurst*, 451 U.S. at 24–25).

As for Plaintiffs' Tenth Amendment argument, it fails because as long as federal action rests on a constitutionally delegated power, "there can be no violation of the Tenth Amendment," *United States v. Mikhel*, 889 F.3d 1003, 1024 (9th Cir. 2018) (citation omitted). The statute under which the Rule was promulgated, 42 U.S.C. § 9836(a)(1), was enacted pursuant to Congress's broad Spending Clause power. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 480 (1982). "Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, . . . [and] to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare." *Sabri v. United States*, 541 U.S. 600, 605 (2004). This power applies even when Congress legislates "in an area historically of state concern." *Id.* at 608 n.*.

Plaintiffs' and the Michigan Legislature's arguments that health and education are within the state's police powers are thus irrelevant. The Secretary did not intrude on state police powers when he issued the Rule any more than he did when he issued the long-standing rules conditioning federal funds on requiring that Head Start personnel do not "pose a significant risk" "of communicable disease." 45 C.F.R. § 1302.93(a). Thus, "the Federal Government, when acting within a delegated power, may override countervailing state interests, whether those interests are labeled traditional, fundamental, or otherwise."

20

*Brackeen v. Haaland*, 994 F.3d 249, 310 (5th Cir. 2021) (quotation marks and citation omitted).

*Missouri* also undermines Plaintiffs' constitutional claims. In their briefing before the Supreme Court, the *Missouri* applicants argued that the CMS mandate violated the Spending Clause, *see* Response to Application for a Stay Pending Appeal, *Becerra v. Louisiana*, Nos. 21A240, 21A241, at 26–27 (U.S. Dec. 30, 2021); unconstitutionally intruded on the states' police powers, *id.* at 23–24, 27; violated the Tenth Amendment, *id.* at 1; and violated the Separation of Powers Doctrine, *id.* at 27. The Supreme Court effectively rejected each of these claims, explaining that it "disagree[d] with respondents' remaining contentions in support of the injunctions entered below." *Missouri*, 142 S. Ct. at 653.

For these reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits of any one of their claims. This factor therefore weighs against granting an injunction.

### B.    Irreparable Harm

The second factor to be considered on a motion for preliminary injunction is whether the movant will suffer irreparable harm without the injunction. *Jones*, 569 F.3d at 265. A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

The Court has already discussed the possibility of irreparable harm to Head Start students and their families in its *Order Granting in Part and Denying in Part Plaintiffs' Motion for Temporary Restraining Order*. (ECF No. 20.) There, the Court found Plaintiffs' argument

21

"to have some persuasive force." *Id.*, PageID.416. Plaintiffs now submit evidence in the form of declarations from each of Plaintiff school districts. (ECF Nos. 42-8, 42-9, 42-10, 42-11, 42-12.)

While each school district is unique, each presents evidence of similar hardships. Plaintiffs first argue that because non-Head Start teachers are not required to be vaccinated, Plaintiffs will be forced to separate the Head Start students from non-Head Start students within their buildings if the Rule is enforced. (ECF Nos. 42-8, PageID.1042-43; 42-12, PageID.1077.) This amounts to segregating the children by income and limits the benefit of increased racial and socioeconomic diversity for the students. Second, Plaintiffs argue that in order to continue receiving Head Start grant money, their facilities would be forced to lose staff members who refuse to get the vaccine.[4] (ECF Nos. 42-8, PageID.1041, 1047; 42-10, PageID.1063-64; 42-11, PageID.1071; 42-12, PageID.1080.) This loss of staff would force the closure of certain services and classrooms until those positions could be filled with vaccinated candidates. Given the current staff shortages and reduced applicant pool due to the vaccine requirement, Plaintiffs state that filling open positions is very difficult. (ECF Nos. 42-8, PageID.1041; 42-10, PageID.1066; 42-11, PageID.1071,1073; 42-12, PageID.1078.) Third, according to testimony from Plaintiffs' witness, Plaintiffs would no longer be able to shift staff or substitutes from non-Head Start classes to Head Start classes to cover Head Start staff absences. And finally, unvaccinated parents of Head Start participants would no

---

[4] Thirty-seven of 137 Livingston Head Start staff are unvaccinated although that number may decrease as medical and religious exemption requests are processed (ECF No. 42-8, PageID.1045, 1046); at least four of 48 total Head Start staff members are unvaccinated in Wayne-Westland (ECF No. 42-10, PageID.1063); in Walled Lake, two of approximately 19 staff members are unvaccinated (ECF No. 42-11, PageID.1070); and in Saginaw 23 of 146 staff members are unvaccinated, though 18 unvaccinated employees qualified for an accommodation (ECF No. 42-12, PageID.1077, 1078).

longer be able to volunteer or work for their child's Head Start program. (ECF Nos. 42-8, PageID.1050; 42-10, PageID.1065; 42-11, PageID.1073-74; 42-12, PageID.1081.)

Plaintiffs' assertions that Head Start participants and their families are likely to be harmed by temporary staff shortages and resulting classroom closures and service interruptions are not wrong. As the Secretary noted, "[p]rogram closures impede Head Start families from participating in the workforce, impose financial hardship on low wage workers who may not have paid time off to care for children who are in quarantine, create instability for children and families who depend on the Head Start program, and delay a full economic recovery for the nation." 86 Fed. Reg. 68058. According to Plaintiffs' declarations, up to nine classrooms could be closed by Plaintiff Livingston Educational Service Agency (ECF No. 42-8, PageID.1047); at least one classroom would be closed by Plaintiff Wayne-Westland community schools (ECF No. 42-10, PageID.1062); one classroom could potentially close for Plaintiff Walled Lake Consolidated School District (ECF No. 42-11, PageID.1071); and 10 classrooms have already closed for Plaintiff Saginaw Intermediate School District due to the announcement of the Rule and other, unrelated, staff shortages (ECF No. 42-12, PageID.1080.) Students' loss of in-person learning time and related hardships on students' families and Plaintiffs constitute "irreparable harm." Thus, this factor weighs in favor of an injunction.

### C.      Substantial Harm to Others

The probability that others will be harmed if an injunction issues is the third factor courts consider. *Jones*, 569 F.3d at 265. Here, this consideration tilts decisively in the Government's favor. Plaintiffs argue they will suffer irreparable harm due to staff shortages leading to classroom closures and program reductions if the Rule is enforced. They ignore, however, that COVID-19 infections among Head Start teachers also close classrooms and

cause interruptions in the services provided to Head Start families. *See id.* at 68055 (noting that when a staff member or child tests positive for COVID-19 "classrooms or entire programs close for a period of days or weeks to allow for test results and quarantining. . . .). At the hearing, an administrative staff member representing Plaintiff Livingston Educational Service Agency testified that "a couple" of classrooms had closed for several days due to COVID-19 infections within the first two months of 2022 alone. The difference between these infection-related closures and closures due to staff shortages is that the former are unpredictable and often occur at the last minute leaving parents to struggle to find suitable last-minute childcare. 86 Fed. Reg. 68076. The Secretary reasoned that, if staff remains unvaccinated, these types of intermittent closures will continue to occur more frequently. *See, e.g.*, *id.* at 68055 (finding that masking and vaccination "are the best defenses against COVID-19" and that "[t]hese measures will also reduce program closures due to SARS-CoV-2 infection.")

The Court also cannot overlook the likelihood of substantial harm, severe illness, hospitalization, or death due to COVID-19 transmission between Head Start staff, contractors, and volunteers; between these adults and the unvaccinated children in their care; and between children and their family members who may or may not be especially vulnerable to the virus. Plaintiffs' irreparable harm is therefore outweighed by the devastating effects that will be felt throughout the Head Start programs and Plaintiffs' local communities.

### D.  The Public Interest

The final factor to be considered is the public's interest in the injunction. *Jones*, 569 F.3d at 265. Nearly two years into this pandemic, the public's greatest interest is undoubtedly slowing or stopping the spread of COVID-19 that has claimed the lives of so many Americans. The Secretary found that vaccines "are the safest and most effective way to

protect individuals and people with whom they live and work from infection and from severe illness and hospitalization if they contract the virus." 86 Fed. Reg. 68054-55. This conclusion is supported by many reputable scientific sources. Thus, the final factor overwhelmingly weighs in favor of denying Plaintiffs' motion.

## IV.   Conclusion

Courts are instructed to balance four factors discussed above before ruling on a motion for preliminary injunction. *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). As detailed above, the Court finds that while Plaintiffs have shown a likelihood of irreparable harm, Plaintiffs are not likely to succeed on the merits of their claims, there is a likelihood of substantial harm to others if an injunction issues, and that the public interest strongly weighs against ruling in Plaintiffs' favor. Accordingly, the balance of factors together weighs against an injunction. Plaintiffs' Motion for Preliminary Injunction (ECF No. 5) is therefore **DENIED** and the TRO previously issued by the Court (ECF No. 20) is **DISSOLVED.**

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated: March 4, 2022


I hereby certify that a copy of the foregoing document was served upon counsel of record on March 4, 2022, by electronic and/or ordinary mail.


s/Lisa Bartlett
Lisa Bartlett
Case Manager